IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-00679-PAB-KLM

TRACEY CANTRELL,

     Plaintiff,

v.

CHRIS GDOWSKI,
SHELLEY BECKER,
KRISTY RICCIO, and
ADAMS 12 FIVE STAR SCHOOLS,

     Defendants.

_____

**ORDER**
_____

     This matter is before the Court on the Motion for Summary Judgment [Docket

No. 27] filed by defendants Chris Gdowski, Shelley Becker, Kristy Riccio, and Adams

12 Five Star Schools (the "district").  This Court has subject matter jurisdiction over Ms.

Cantrell's 42 U.S.C. § 1983 claims pursuant to 28 U.S.C. § 1331 and over Ms.

Cantrell's state law claims pursuant to § 1367.[1]

**I. BACKGROUND**[2]

     In August 2011, Ms. Cantrell began working for the district as the Fiscal Manager

of Student Support Services.  Docket No. 27 at 2, ¶ 1.  Mr. Gdowski is the district's

Superintendent.  Ms. Becker is the district's Chief Financial Officer.  Ms. Riccio is a

_____

     [1]Although Ms. Cantrell's amended complaint does not contain any jurisdictional
allegations, *see generally* Docket No. 16, the Scheduling Order indicates that she
asserts jurisdiction pursuant to § 1331 and § 1367.

     [2]The following facts are undisputed unless otherwise indicated.

Human Resources Director with the district.

The Student Support Services department provides health services, preschool, and special education services.  Docket No. 30-1 at 1, ¶ 1.  Ms. Cantrell's duties included reviewing, analyzing, interpreting, and summarizing financial data, responding to inquires related to account information, reporting needs, and financial questions, and communicating with various district officials and staff.  Docket No. 27-1 at 1.  Ms. Cantrell reported directly to the Director of Student Support Services Brian Printz. Docket No. 30-1 at 1, ¶ 1.  Ms. Cantrell states that she never reported to the district's Board of Education.  *Id.*

Ms. Cantrell's contract with the district provided that her employment could be terminated at any time for cause.  Docket No. 27-2 at 2, ¶ 9.  Higher level supervisors such as Ms. Becker could recommend employees for termination, but only Mr. Gdowski or the district's Director of Human Resources Mark Hinson had authority to formally terminate an employee.  Docket No. 30 at 9, ¶ 65.  A list of proposed personnel actions, such as hiring, termination, or unrenewed contracts would then be presented to the board for approval.  Docket No. 30-10 at 2, p. 14:1-23.

Ms. Becker was one of Ms. Cantrell's supervisors during her employment. Docket No. 27 at 2-3, ¶ 4.  In May 2012, Ms. Becker asked Ms. Cantrell to assist in the preparation of the district's 2012-2013 fiscal year budget by compiling a spreadsheet of the district's full-time equivalent employees ("FTEs") and their respective salaries.  *Id.* at 3, ¶ 5.  In the course of compiling this information, Ms. Cantrell believed that she found approximately $12 million in unverifiable salary expenses.  *Id.* at 3, ¶ 6.  Ms. Cantrell claims the $12 million represented 569 employees that did not exist.  Docket No. 30 at

2

3, ¶ 32.  Defendants admit that there was approximately $12 million in unverifiable salary expenses, but assert that Ms. Cantrell's calculations were incorrect for failure to include numerous items charged to salary accounts such as retirement stipends, coaching stipends, extra duty and overtime pay, and professional and military leave. Docket No. 33 at 4, ¶ 31.  Ms. Cantrell reported her findings to Ms. Becker and the district's budget consultant Vickie Lisco, but Ms. Becker and Ms. Lisco did not act on such information.  Docket No. 27 at 3, ¶ 6.  Ms. Cantrell asserts that, on June 19, 2012, Ms. Becker asked Ms. Cantrell to find untraceable employees that Ms. Becker could put in the budget, Docket No. 30 at 3, ¶ 33, which Ms. Becker denies.  Docket No. 33-3 at 1, ¶ 1.  On June 22, 2012, Ms. Cantrell reported her findings to the district's internal auditor Gina Holub, who asked Ms. Cantrell to save Ms. Lisco's original budget model on Ms. Cantrell's work computer, which she did.  Docket No. 27 at 3, ¶ 9.  Ms. Holub discovered additional unsupported expenses in the budget totaling $17 million.  Docket No. 30 at 3-4, ¶ 34.  Defendants deny that Ms. Holub's calculations were correct.

Considerable portions of the parties' briefs are devoted to the question of whether or not the district engaged in budgetary improprieties.  However, the arguments and evidence the parties provide with respect to this issue are largely irrelevant to resolving the present motion.  The Court will discuss Ms. Cantrell's allegations of budgetary improprieties and the district's response to such allegations only to the extent necessary to place Ms. Cantrell's claims in the appropriate context.  Ms. Cantrell's theory regarding the relevance of such alleged improprieties appears to be as follows: A fact finding hearing with the teachers union was set to take place in October 2012, where a hearing officer would decide how much money the teachers' union could

3

demand from the district during contract negotiations.  Docket No. 30 at 5-6, ¶¶ 45-46.

The more money the district spent, the less the teachers' union could demand that the

district distribute to teachers.  *Id.* at 6-7, ¶¶ 46-52.  As such, during negotiations with the

teachers' union, it was better for the district to seem to be spending more money on

employee salaries than it actually was.  *Id.*  Ms. Cantrell asserts that the district

overestimated salary expenditures in its 2012-2013 budget by as much as $17 million

so as to place it in a more favorable position when negotiating with the teachers' union.

The district denies these allegations and asserts that its audited financials for the 2012-

2013 fiscal year demonstrate that its budgeted salary expenses exceeded its actual

salary expenditures by approximately $300,000.  Docket No. 27 at 6, ¶ 29.

On July 24, 2012, upon learning that Ms. Cantrell had reported her findings to

Ms. Holub, Ms. Becker came into Ms. Cantrell's office and, pressing her body into Ms.

Cantrell's back, said "How dare you go above my head."  *Id.* at 4, ¶ 35.  Ms. Becker

denies threatening or making physical contract with Ms. Cantrell.  Docket No. 33-3 at 1,

¶ 2.  Later that day the Mr. Hinson met with Ms. Becker and Ms. Cantrell to discuss Ms.

Cantrell taking her concerns directly to Ms. Holub.  Docket No. 30-1 at 2, ¶ 8.  Ms.

Cantrell later complained about the incident to Superintendent Gdowski.  *See* Docket

No. 33-11.  District's staff attorney Craig Hein was assigned to investigate Ms. Cantrell's

complaint.  Docket No. 30-1 at 2, ¶ 9.

In August 2012, Ms. Cantrell contacted the Colorado Department of Education

regarding her findings regarding un-accounted for FTEs and was advised to take her

findings to the state teachers' union and to the press.  Docket No. 27 at 3, ¶ 8.

Defendants assert that, on August 17, 2012, Ms. Cantrell met with Ms. Becker,

4

Mr. Hein, and Ms. Riccio to discuss Ms. Cantrell's complaint regarding Ms. Becker, whereas Ms. Cantrell asserts that this meeting took place on August 24, 2012. Docket No. 33 at 6, ¶ 38; Docket No. 30 at 4, ¶ 38. The parties agree that, at this meeting, Mr. Hein explained to Ms. Cantrell that, because he could not determine what happened during the July 24 incident with Ms. Becker, no action would be taken against Ms. Becker. Docket No. 30 at 4, ¶ 38. Defendants assert that, on August 24, 2012, a meeting between Ms. Cantrell, Ms. Becker, Mr. Hein, and Ms. Riccio took place to discuss Ms. Cantrell's job performance, including concerns regarding attendance, teamwork, cooperation, and communications. Docket No. 27 at 3-4, ¶ 11. Ms. Cantrell denies that any meeting took place regarding her job performance. Docket No. 30 at 2, ¶ 11.

During the summer of 2012, four budget meetings took place where Ms. Holub raised concerns that the district was intentionally inflating budgeted salary figures. Docket No. 27 at 4, ¶¶ 13-14; Docket No. 30 at 5, ¶ 43. Ms. Cantrell claims that the district failed to address Ms. Holub's concerns in those meetings. Docket No. 30 at 5, ¶ 43.

Due in part to Ms. Holub's allegations of improper activity, the district retained an outside expert in school financing, Vody Herrmann. Docket No. 27 at 4, ¶ 15. Ms. Herrmann concluded that the district had a recurring problem with underspending its budget, but found no unethical or illegal activity in relation to the budget and rejected Ms. Holub's claim that salary expenses in the 2012-2013 budget were inflated by $17 million. Docket No. 27 at 4, ¶ 16; Docket No. 27-4 at 2, ¶ 7. Ms. Cantrell asserts that Ms. Herrmann never evaluated specific issues regarding salary expenses. Docket No.

30 at 5, ¶ 44.

In early September 2012, Ms. Holub provided the teachers' union with information regarding the 2012-2013 budget.  Docket No. 30-2 at 5, ¶ 28.  In October 2012, Ms. Cantrell spoke with a representative from the state teachers' union regarding unverified salary expenses.  Docket No. 27 at 4, ¶ 17.  On October 19, 2012, the district terminated Ms. Holub's employment.  Docket No. 27 at 5, ¶ 18.  Ms. Cantrell claims that Ms. Holub was terminated in part for providing information to the teachers' union.  Docket No. 30 at 9, ¶ 66.

On February 4, 2013, a local Fox television station aired an interview with Ms. Holub conducted by reporter Josh Bernstein as part of a story on the district's budget.  Docket No. 27 at 5, ¶ 19; *see also* Docket No. 30-14 ("Tonight's news story regarding the district's purported financial practices is the result of misinformation fed to a reporter by disgruntled former employee Gina Holub.").  On February 13, 2013, Ms. Holub sent a letter to the district informing it of her intent to file suit.  Docket No. 30-16.  On February 19, 2013, Ms. Cantrell attended a department meeting where Mr. Hein discussed imposing a litigation hold in response to Ms. Holub's letter.  Docket No. 30-1 at 3, ¶ 14.  According to Mr. Hein, "[b]ecause Ms. Holub was alleging that the District had inflated the estimated salaries in the 2012-2013 fiscal year budget by $17 million, and her allegations were based in part on draft work product produced by Tracey Cantrell," the district's IT department took Ms. Cantrell's computer and the computer of another employee who worked with Ms. Holub, Maxine Newmark.  Docket No. 27-6 at 1, ¶ 3.  The IT department created a disk image of Ms. Cantrell's computer and returned it to her.  *Id.* at 1, ¶ 4; Docket No. 30-1 at 3, ¶ 14.  Mr. Hein states that the

district did not examine Ms. Cantrell's computer or the disk image until March, 8, 2013, when he ordered IT to conduct a forensic examination of Ms. Cantrell's and Ms. Newmark's disk images.  Docket No. 27-6 at 2, ¶¶ 5-6; Docket No. 27-7.  Ms. Cantrell does not provide any evidence disputing Mr. Hein's statements regarding the timing of the district's forensic examination of her disk image.  Docket No. 30 at 2, ¶ 21.

According to Ms. Becker and Mr. Printz, Ms. Cantrell continued to have performance issues.  Docket No. 27 at 5, ¶ 22; *see also* Docket No. 27-4; Docket No. 27-8.  Ms. Becker recommended that the district terminate Ms. Cantrell's employment. Docket No. 30-18 at 2, p. 63:20-24.  On February 27, 2013, Ms. Riccio placed Ms. Cantrell on administrative leave.  Docket No. 27 at 5, ¶ 23.  On February 28, 2013, Ms. Cantrell spoke with Mr. Bernstein and told him that she provided information to Ms. Holub.  *Id.* at 5, ¶ 24.  On March 4, 2013, Ms. Riccio and Ms. Becker conducted a pre-termination hearing to inform Ms. Cantrell of the reasons they were recommending her for termination.  *Id.* at 5-6, ¶ 25.  Those reasons included continued failure to attend scheduled meetings, failure to accept meeting invitations, continued lack of interest in teamwork, providing inaccurate information regarding the posting of a special education position to the district's budget manager, providing work product that was unclear and hard to follow, failing to complete the daily process of approving job positions or failing to find another employee to complete the task, and complaints from staff that Ms. Cantrell treated them in a rude or disrespectful manner.  Docket No. 27-5 at 2-3, ¶ 6. Ms. Cantrell was given an opportunity at the pre-termination hearing to respond to each of the identified issues, but Ms. Riccio concluded that Ms. Cantrell's responses were insufficient.  Docket No. 27-5 at 3, ¶¶ 8-9.  Ms. Cantrell was given an opportunity to

resign, but declined, and, as a result, her employment with the district was terminated effective March 8, 2013.  *Id.* at 3, ¶¶ 9-11.  Mr. Gdowski did not object to the recommendation to terminate plaintiff.  Docket No. 33-7 at 1, ¶ 1.  On March 12, 2013, Ms. Riccio provided Ms. Cantrell with a letter explaining the reasons for the district's decision to termination her employment.  Docket No. 27-9 at 1-2.

Ms. Becker, Ms. Riccio, and Mr. Gdowski state that, at the time of the decision to terminate Ms. Cantrell's employment, they did not know that Ms. Cantrell had been communicating with the teachers' union or the press regarding irregularities in the budgeted salaries for the 2012-2013 fiscal year.  Docket No. 27-4 at 3, ¶ 19; Docket No. 27-5 at 3, ¶ 7; Docket No. 27-10 at 1, ¶ 3.  Board of Education member Norm Jennings testified that, in the fall or winter of 2012, Ms. Becker informed the Board of Education that the district suspected someone in the finance department of feeding information to Ms. Holub, but did not mention a name.  Docket No. 30-9 at 4, pp. 87:17-88:1.  Mr. Jennings also testified:

Q.  And what was your understanding of the district's understanding of the connection between Ms. Cantrell and Ms. Holub?

A.  From what I understand it sounds like they were working together, that Ms. Cantrell was giving more work product information to Ms. Holub after she was terminated from the district.

Q.  Okay.  Was the board told about the termination of Ms. Cantrell?

A.  Yes.

Q.  What was the board told?

A.  Just that she had been terminated for cause and similar reasons and circumstances to Ms. Holub.

Q.  Anything else?

A.  Other than she didn't go on to the Fox report and stuff like that.

Q.  Anything else you remember?

A.  No.

*Id.* at 3-4, pp. 84:21-85:14.  Mr. Jennings later testified that, at the time the Board of

Education was notified of Ms. Cantrell's termination, no one had identified Ms. Cantrell

to the board as Ms. Holub's source of information.  *Id.* at 4, p. 88:2-21.

Ms. Cantrell states that, between August 24, 2012 and her pre-termination

hearing, she received no oral or written notice of performance issues.  Docket No. 30-1

at 3, ¶ 13.  Ms. Cantrell asserts that the stated reasons for her termination are false and

pretext for the district's decision to terminate her because it believed her to be the

"inside source to help Ms. Holub in her efforts to show that the district had presented a

fraudulent budget."  *Id.* at 3, ¶ 16.

On March 14, 2013, Ms. Cantrell filed this case.  Docket No. 1.  On June 27,

2013, Ms. Cantrell filed an amended complaint.  Docket No. 16.  Pursuant to 42 U.S.C.

§ 1983, Ms. Cantrell alleges that defendants retaliated against her in violation of her

First Amendment rights and that defendants violated her Fourteenth Amendment right

to procedural due process.  *Id.* at 7.  Ms. Cantrell also asserts state law claims against

defendants for breach of contract, intentional interference with a contractual

relationship, and wrongful discharge in violation of public policy.  *Id.* at 7-10.

In the present motion, defendants seek summary judgment on all of Ms.

Cantrell's claims.  Docket No. 27 at 2.  In response, Ms. Cantrell agrees to dismiss her

due process claim and all claims against Ms. Riccio.  Docket No. 30 at 1.  The motion is

fully briefed and ripe for disposition.  In addition, Ms. Cantrell filed a sur-reply [Docket

No. 39] and a motion for leave to correct the record [Docket No. 46], which were accepted for filing, and defendants filed a notice of supplemental authority [Docket No. 49].

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

However, "[w]hen, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998)) (internal quotation marks omitted). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a

material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)).  "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party."  *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

**III.  ANALYSIS**

**A.  First Amendment Retaliation**

Defendants argue that any information Ms. Cantrell shared with Ms. Holub was done within the scope of Ms. Cantrell's employment and that none of the individuals who participated in the decision to terminate her employment were aware that Ms. Cantrell had spoken to the teachers' union or the press or provided Ms. Holub with information.  Docket No. 27 at 7.

A government employer may not "condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression [under the First Amendment]."  *Morris v. City of Colo. Springs*, 666 F.3d 654, 660 (10th Cir. 2012) (quotations omitted).  In order to protect public employees' rights, the Tenth

Circuit employs the *Garcetti/Pickering* test, which asks

> 1) whether the speech was made pursuant to an employee's official duties;
> (2) whether the speech was on a matter of public concern; (3) whether the
> government's interests, as employer, in promoting the efficiency of the public
> service are sufficient to outweigh the plaintiff's free speech interests; (4)
> whether the protected speech was a motivating factor in the adverse
> employment action; and (5) whether the defendant would have reached the
> same employment decision in the absence of the protected conduct.

*Id.* at 661 (quoting *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)).  The first

three prongs are considered questions of law and the last two prongs are questions of

fact.  *Dixon*, 553 F.3d at 1302.  For purposes of the present motion, only the first and

fourth prongs are in dispute.

As to the first prong, "when public employees make statements pursuant to their

official duties, the employees are not speaking as citizens for First Amendment

purposes."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  The Supreme Court has

refused "to recognize First Amendment claims based on government employees' work

product" because "[r]estricting speech that owes its existence to a public employee's

professional responsibilities does not infringe any liberties the employee might have

enjoyed as a private citizen."  *Id.* at 421-22.  The Tenth Circuit has indicated that it is

appropriate to consider both the "content of the speech, as well as the employee's

chosen audience, to determine whether the speech is made pursuant to an employee's

official duties."  *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir.

2010).

With regard to the content of the speech, speech may be made pursuant to

official duties "even if it deals with activities that the employee is not expressly required

12

to perform." *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008) (quotations omitted). However, whether or not the speech is on a topic "committed to [the] care" of the employee remains an important consideration, *see Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1332 (10th Cir. 2007). The First Amendment does not allow employees the "'right to perform their jobs however they see fit.'" *Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007) (quoting *Garcetti*, 547 U.S. at 422). With regard to the employee's chosen audience, "speech directed at an individual or entity within an employee's chain of command is often found to be pursuant to that employee's official duties." *Rohrbough*, 596 F.3d at 747. Speech occurring outside the workplace, after hours, with ordinary citizens may be considered not within the scope of one's official duties. *See id.*; *Thomas*, 548 F.3d at 1325 ("when Mr. Thomas went beyond complaining to his supervisors and instead threatened to report to [an] agency outside his chain of command, his speech ceased to be merely 'pursuant to his official duties'"). However, this is not necessarily dispositive; rather, the focus remains on "whether the speech 'stemmed from and [was of] the type . . . that [the employee] was paid to do,' regardless of the exact role of the individual or entity to which the employee has chosen to speak." *Rohrbough*, 596 F.3d at 747 (quoting *Green*, 472 F.3d at 798).

With respect to the fourth prong, "[a]n employer's knowledge of the protected speech, together with *close* temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment." *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005) (emphasis in original). In

order to establish causation, an employer must know of the protected conduct prior to making the complained of adverse employment decision. *See Hook v. Regents of Univ. of Cal.*, 394 F. App'x 522, 539 (10th Cir. 2010) (unpublished) ("Axiomatic to establishing causation in th[e First Amendment retaliation] context is proof that the employer knew of the employee's protected conduct."); *Dillon v. Twin Peaks Charter Acad.*, No. 99-cv-02462-CMA-BNB, 2009 WL 2982008, at *2 (D. Colo. Sep. 11, 2009) (ruling that, under *Garcetti*/*Pickering* test, plaintiff must establish that "employer knew about the plaintiff's protected activity before taking the adverse employment action").

Ms. Cantrell's claim appears to be based primarily on her communications with Ms. Holub and to a lesser extent on her communications directly with the teachers' union and Mr. Bernstein.[3]

### 1. Communications with Ms. Holub

Ms. Cantrell concedes that "she was not terminated for initially going to Ms. Holub" and that, in June 2012, she was acting within the scope of her duties in reporting to Ms. Holub. Docket No. 30 at 12. On this point, Ms. Cantrell is correct. Ms. Cantrell's reporting her findings to Ms. Holub in June 2012 and her saving a budget model on her computer were activities committed to Ms. Cantrell's care as a fiscal manager and fell within her duties to "[r]eview, analyze, interpret, and summarize financial data and prepare related spreadsheets and analyses" and to communicate with "auditors regarding budgets." *See* Docket No. 27-1; *cf. Rohrbough*, 596 F.3d at 749. Thus, Ms.

---

[3]Ms. Cantrell does not appear to claim that she was terminated in retaliation for speaking with the Colorado Department of Education. Regardless, there is no evidence that defendants were aware of such conduct.

14

Cantrell did not engage in protected conduct when initially communicating with and providing information to Ms. Holub.

The question then becomes whether, after these initial communications with Ms. Holub, Ms. Cantrell can establish that she engaged in any instances of protected speech with Ms. Holub and whether such instances were a motivating factor in defendants' decision to terminate her employment.  Ms. Cantrell does not explicitly admit or deny speaking with or providing information to Ms. Holub on any other occasions, but, more importantly, does not identify with reference to specific facts any instances where she engaged in protected speech with Ms. Holub.  *See Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1025 (10th Cir. 1992) ("In the absence of such specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury.").  No such instances of protected communication are apparent from the record. To the contrary, Ms. Cantrell admits that "[n]othing else of any significance transpired" between Ms. Holub's termination in October 2012 and February 4, 2013, when the local television station aired a story featuring Ms. Holub.  Docket No. 30 at 13.  Ms. Holub's declaration states that "[a]t the beginning of my investigation, Ms. Cantrell showed me that she calculated that there were 3,250 FTE's," but does not otherwise specifically mention any interactions between Ms. Holub and Ms. Cantrell.  Docket No. 30-2 at 4, ¶ 20; *id.* at 1, ¶ 1.  Ms. Cantrell's declaration states that, on June 22, 2012, she brought her concerns to Ms. Holub's attention, but does not otherwise specifically mention any interactions between Ms. Holub and Ms. Cantrell.  Docket No. 30-1 at 2, ¶ 6.  Ms. Cantrell testified that she had no advance notice that the February 4, 2013 news story

15

would air, did not talk to Ms. Holub about the story before it aired, and did not know what documents Ms. Holub gave to the television reporter. Docket No. 27-3 at 7, pp. 67:22-68:18. Moreover, defendants disclaim any contemporaneous knowledge of Ms. Cantrell engaging in protected communication with Ms. Holub. Ms. Becker's declaration states, "I had no knowledge that Ms. Cantrell had any involvement whatsoever in Ms. Holub's communications with the union or the press." Docket No. 33-3 at 3, ¶ 15; *see also* Docket No. 33-4 at 1, ¶ 1; Docket No. 33-7 at 1, ¶¶ 1-2.

Ms. Cantrell suggests that she can engage in protected conduct when using another individual to make a communication. The Tenth Circuit has recognized that an employee may use another individual "as her agent to engage in protected citizen whistleblowing," but only if doing so is not pursuant to that employee's official duties. *Casey*, 473 F.3d at 1329. Here, however, Ms. Cantrell identifies no evidence that she asked or intended for Ms. Holub to speak to anyone on her behalf and, as discussed above, there is no evidence that Ms. Cantrell provided Ms. Holub with information outside the scope of Ms. Cantrell's employment. *Cf. id.* at 1329-30 (holding that employee ordering a subordinate to report regulatory noncompliance was acting within the scope of her official duties). Ms. Cantrell testified that she spoke with Ms. Holub after the story aired, but there is no indication that defendants were aware of this conversation. Docket No. 27-3 at 7, pp. 67:22-68:18.

Ms. Cantrell also argues that the district seized her computer prior to her termination, but does not indicate what the district would have found or provide evidence disputing Mr. Hein's assertion that no one at the district examined the contents of her computer prior to her termination. These incidents cannot therefore

16

have been a motivating factor in defendants' decision to terminate Ms. Cantrell's employment. *See Hook*, 394 F. App'x at 539. Ms. Cantrell does not argue otherwise.

Ms. Cantrell's primary argument appears to be, not that she actually provided information to Ms. Holub for use in the February 4, 2013 news story outside the scope of her employment, but that defendants "believed that Ms. Cantrell was the inside source for Ms. Holub's speech to Fox News." Docket No. 30 at 12. In support of her argument, Ms. Cantrell contends that Mr. Jennings' deposition testimony concerning his "understanding of the district's understanding" of the connection between Ms. Cantrell and Ms. Holub should be construed to establish that the district knew that Ms. Cantrell aided Ms. Holub's reports to the press prior to terminating Ms. Cantrell. *Id.* at 12-13 (citing Docket No. 30-9 at 3-4, pp. 84:21-85:2). However, "a First Amendment retaliation claim seeks to vindicate a public employee's exercise of free speech rights when she has suffered an adverse employment action in response to having spoken out publicly. It cannot be used to remedy a case of mistaken identity." *Wasson v. Sonoma Cnty. Junior Coll.*, 203 F.3d 659, 663 (9th Cir. 2000) (citing *Waters v. Churchill*, 511 U.S. 661, 679 (1994) ("We have never held that it is a violation of the Constitution for a government employer to discharge an employee based upon substantively incorrect information.")). Thus, "a free-speech retaliation claim is actionable under § 1983 only where the adverse action at issue was prompted by an employee's actual, rather than perceived, exercise of constitutional rights." *Heffernan v. City of Paterson*, 777 F.3d 147, 153 (3d Cir. 2015); *see also McBeth v. Himes*, 598 F.3d 708, 717 (10th Cir. 2010) (noting that "engaged in constitutionally protected activity" is the first element

17

of traditional First Amendment retaliation claim).   Here, even assuming that Mr.

Jennings' testimony could be construed in the manner Ms. Cantrell suggests,[4] the

possibility that the district may have perceived that she spoke or provided information to

Ms. Holub is insufficient to sustain a First Amendment retaliation claim.   Moreover, as

discussed above, Ms. Cantrell fails to identify any instances of protected speech to Ms.

Holub that the district could have actually known about and acted upon.   *Cf. Wasson*,

203 F.3d at 662 (rejecting First Amendment retaliation claim where plaintiff asserted

that "defendants retaliated against her for speech that she insists she did not make");

*Jones v. Collins*, 132 F.3d 1048, 1054 (5th Cir. 1998) ("The fact that Collins transferred

her on the basis of a mistaken belief that she spoke out in a manner that we assume for

the sake of argument would have been constitutionally protected fails to establish a

violation of Jones's First amendment rights."); *Fogarty v. Boles*, 121 F.3d 886, 887, 890

(3d Cir. 1997) (concluding that teacher could not sustain claim that he was punished

based upon school principal's erroneous belief that teacher had contacted press about

a matter of public interest because "there was no conduct that was constitutionally

protected – indeed, there was no conduct – period");   *Barkoo v. Melby*, 901 F.2d 613,

619 (7th Cir. 1990) (holding that, where employee maintained that she did not actually

---

[4]Defendants correctly point out that the portion of Mr. Jennings' testimony upon which Ms. Cantrell relies does not support her point.  There is no indication from the deposition excerpt when Mr. Jennings formed his understanding concerning Ms. Cantrell providing work product to Ms. Holub.  Without proof that it occurred before the adverse employment action, it is irrelevant.  Moreover, even assuming that Ms. Cantrell *actually* provided "work product" to Ms. Holub after their initial communication in the summer of 2012, *see* Docket No. 30-9 at 3-4, pp. 84:21-85:2, Ms. Cantrell does not explain why such information would not "owe[] its existence to [her] professional responsibilities."  *See Garcetti*, 547 U.S. at 421.

provide information to press, "[t]o the extent Barkoo alleges that her employers retaliated against her because they *thought* she was engaged in First Amendment protected speech on an issue of public concern, we reject the notion that this allegation brings her claim within the requirements of § 1983").

Ms. Cantrell fails to establish that she engaged in protected speech with Ms. Holub and that any such speech was a motivating factor in defendants' decision to terminate her employment.  As a result, there is no basis for her claim that defendants retaliated against her in violation of the First Amendment because of her communications with Ms. Holub.

### 2.  Communications with the Teachers' Union and Mr. Bernstein

To the extent Ms. Cantrell asserts that defendants retaliated against her for speaking with the teachers' union and Mr. Bernstein, her First Amendment retaliation claim fails.  In October 2012, Ms. Cantrell spoke with Rob Kellogg from the teachers' union about unverified salary expenses in the district's 2012-2013 budget.  Docket No. 27 at 4, ¶ 17.  Prior to February 4, 2013, Ms. Cantrell did not speak with the local television station that reported on the district's budget issues.  Docket No. 27-3 at 7, p. 67:16-21.  On February 28, 2013, after she was placed on administrative leave, Ms. Cantrell discussed her findings regarding the district's budget with Mr. Bernstein and provided him with various documents.  *Id.* at 7-8, pp. 68:23-70:1.  Assuming, without deciding, that this speech satisfied the first three prongs of the *Garcetti/Pickering* test, the Court finds that Ms. Cantrell fails to provide evidence rebutting Ms. Becker's, Ms. Riccio's, and Mr. Gdowski's statements that, at the time of the decision to terminate Ms. Cantrell's employment, they did not know that Ms. Cantrell had been communicating

with the teachers' union or the press regarding irregularities in the budgeted salaries for the 2012-2013 fiscal year.  Docket No. 27-4 at 3, ¶ 19; Docket No. 27-5 at 3, ¶ 7; Docket No. 27-10 at 1, ¶ 3.  As a result, Ms. Cantrell identifies no evidence upon which a reasonable juror could conclude that her statements to the teachers' union and Mr. Bernstein were a motivating factor in defendants' decision to terminate her employment.  *Cf. Duvall v. Putnam City Sch. Dist., Indep. Sch. Dist. No. 1 of Okla. Cnty.*, 530 F. App'x 804, 815 (10th Cir. 2013) (unpublished) (resolving First Amendment retaliation claim under the fourth prong of the *Garcetti/Pickering* test).

Because Ms. Cantrell fails to show that Ms. Becker, Ms. Riccio, Mr. Gdowski, or any other district policymaker[5] violated her First Amendment rights, defendants' motion for summary judgment on Ms. Cantrell's First Amendment retaliation claim will be granted.

## B.  Procedural Due Process

Ms. Cantrell concedes to the dismissal of her procedural due process claim. Docket No. 30 at 15.  As a result, defendants' motion for summary judgment on Ms. Cantrell's procedural due process claim will be granted.

## C.  Remaining Claims

Ms. Cantrell concedes to the dismissal of all claims against Ms. Riccio.  Docket

---

[5]A local governmental entity "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978) (footnote omitted); *see also Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (noting that official "policy or custom" may be shown by evidence of, among other things, decisions of employees with final policy-making authority or the ratification by a final decisionmaker of a subordinate's actions).

No. 30 at 1.  As a result, defendants' motion for summary judgment with respect to Ms.

Cantrell's claims against Ms. Riccio will be granted.

Having dismissed Ms. Cantrell's claims arising under federal law, the Court next

addresses the issue of whether it should exercise supplemental jurisdiction over her

remaining claims against Mr. Gdowski, Ms. Becker, and the district, which are based

upon state law.  While courts may exercise supplemental jurisdiction over state law

claims if there is otherwise a jurisdictional basis for doing so, 28 U.S.C. § 1367(c)(3)

states that a court may decline to exercise jurisdiction over such claims if "the district

court has dismissed all claims over which it has original jurisdiction."  When

§ 1367(c)(3) is implicated in the Tenth Circuit, courts are advised to dismiss pendent

state law claims "'absent compelling reasons to the contrary.'"  *Brooks v. Gaenzle*, 614

F.3d 1213, 1230 (10th Cir. 2010) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir.

1995) (reversing the district court's grant of summary judgment on state law claims);

*Endris v. Sheridan Cnty. Police Dep't*, 415 F. App'x 34, 36 (10th Cir. 2011) ("any state-

law claims for assault and battery or mental and emotional injury were inappropriate

subjects for the exercise of pendent jurisdiction where all federal claims had been

dismissed").  *But see Henderson v. Nat'l R.R. Passenger Corp.*, 412 F. App'x 74, 79

(10th Cir. 2011) (finding no abuse of discretion in trial court's decision to retain

jurisdiction over state law claims after plaintiff voluntarily dismissed claims arising under

federal law).  Finding no compelling reason here to retain jurisdiction, the Court will

dismiss Ms. Cantrell's remaining claims without prejudice.  *See* Colo. Rev. Stat. § 13-

80-111 (permitting claims properly commenced within the statute of limitations to be re-

filed if involuntarily dismissed because of lack of jurisdiction); *Dalal v. Alliant Techsystems, Inc.*, 934 P.2d 830, 834 (Colo. App. 1996) (interpreting 28 U.S.C. § 1367(d) as tolling the statute of limitations while claim is pending in federal court); *see also City of Los Angeles v. Cnty. of Kern*, 328 P.3d 56, 65 (Cal. 2014) (noting that interpretations of § 1367(d) vary between jurisdictions).

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendants' Motion for Summary Judgment [Docket No. 27] is **GRANTED** in part as indicated in this order.  It is further

**ORDERED** that Ms. Cantrell's 42 U.S.C. § 1983 claims for violation of her First Amendment rights and violation of her Fourteenth Amendment procedural due process rights are **DISMISSED** with prejudice against all defendants.  It is further

**ORDERED** that Ms. Cantrell's state law claims against Ms. Riccio for breach of contract, intentional interference with a contractual relationship, and wrongful discharge in violation of public policy are **DISMISSED** with prejudice.  It is further

**ORDERED** that Ms. Cantrell's state law claims against Mr. Gdowski, Ms. Becker, and the district for breach of contract, intentional interference with a contractual relationship, and wrongful discharge in violation of public policy are **DISMISSED** without prejudice.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendants may have their costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is dismissed in its entirety.

DATED March 23, 2015.

BY THE COURT:

  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge